AO 91 (Rev. 11/11)   Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT

**4/9/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ **LM** ___ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**APR 9 2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ **DTS** ___ DEPUTY

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Jairo Reynaga Guizar and | ) |
| Nylene Kristine Amesquita | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

Case No.   5:21-mj-00269

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 2020 to August 2020 _____ in the county of _____ San Bernardino _____ in the _____ Central _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1708 and 1343 | Possession of Stolen Mail Wire Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
/s/ pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

Rocio Gonzalez, US Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   04/09/2021

_____
*Judge's signature*

City and state:   Riverside, California

Honorable Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* J. Nam (213) 590-6188

**AFFIDAVIT**

I, Rocio Gonzalez, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Postal Inspector ("PI") with the United States Postal Inspection Service ("USPIS") and have served in this capacity for 14 years.  I am presently assigned to the External Crimes Team in the San Bernardino Domicile of the Los Angeles Division.  My responsibilities as a Postal Inspector include investigating unemployment insurance fraud, mail fraud, identity theft, crimes against the United States Postal Service ("USPS"), crimes related to the misuse and attack of the mail system, and assaults and threats against USPS employees.  I am a graduate of the USPIS Career Development Unit ("CDU") in Potomac, Maryland where I completed the Postal Inspector Basic Training.  As part of the 16-week residential training provided at the USPIS CDU, I successfully completed mail fraud courses detailing how mail thieves steal in various ways in order to gain access to items such as checks, money orders, cash, and gift cards, as well as individuals' personal information, and use such information to commit bank fraud, check fraud, and access device fraud with credit cards and debit cards.  Due to my expertise in mail fraud investigations, I have served as a course instructor at the CDU and assisted in revising and updating the Mail Fraud Basic Training Course.

## II.   PURPOSE OF AFFIDAVIT

2.   I make this affidavit in support of a criminal complaint and arrest warrant against JAIRO REYNAGA GUIZAR ("GUIZAR") and NYLENE KRISTINE AMESQUITA ("AMESQUITA") for violations of Title 18, United States Code, Sections 1708 (Possession of Stolen Mail) and 1343 (Wire Fraud).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.   BACKGROUND INFORMATION ON UNEMPLOYMENT INSURANCE BENEFITS AND COVID-19-RELATED FRAUD

### A.   Unemployment Benefits

4.   Since 1935, the DOL's UI program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own.  This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while the worker seeks employment.  UI beneficiaries who meet the requirements of the applicable state law are eligible for this temporary financial assistance.  Each state administers a

separate UI program within the guidelines established by federal law.  In the state of California, the EDD administers the UI program for residents and others physically performing work activities in California.

5.   Generally speaking, regular UI claimants must be: (1) unemployed through no fault of their own; (2) able and available for work; (3) willing to accept suitable work; and (4) actively seeking work.

**B.    PUA Under the CARES Act**

6.   On March 13, 2020, the President of the United States declared the COVID-19 pandemic an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  On March 27, 2020, the CARES Act was enacted to provide emergency assistance and health care response for individuals, families, and businesses affected by the COVID-19 pandemic.  The CARES Act included, among others, the establishment of (1) PUA benefits to provide financial assistance to individuals who are out of work due to the pandemic, including those who do not usually qualify for regular state UI benefits such as self-employed, contract, and "gig workers," (2) the Pandemic Emergency Unemployment Compensation ("PEUC") benefit, a 13-week benefit extension for people who have used all benefits available in their regular UI claim, and (3) the Pandemic Additional Compensation ("PAC") benefit, an additional $600 federal stimulus payment automatically added to each week of benefits received between March 29, 2020 and July 25, 2020.

7.    On August 8, 2020, after Federal Pandemic Unemployment Compensation ("FPUC") expired, the President signed a Presidential Memorandum authorizing the Federal Emergency Management Agency ("FEMA") to use disaster relief funds pursuant to Section 408 Other Needs Assistance of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19.  The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds.  The period of assistance for LWAP is August 1, 2020 to December 27, 2020, or termination of the program, whichever is sooner.

8.    On December 27, 2020, the President signed into law the Consolidated Appropriations Act of 2021.  The guidance provided states with important information about several provisions of the law, including the extension of programs first authorized by the CARES Act earlier in the year, as well as the creation of a new UI benefit for "mixed earners."

9.    The law extended the PUA program created by the CARES Act, which provides UI benefits to gig workers and others not traditionally eligible for them.  Under the law, the end of the period of applicability for the PUA program extended to those weeks of unemployment ending on or before March 14, 2021.  In states where the week of unemployment ends on a Sunday, the last payable week of PUA was the week ending March 14, 2021 (March 13 if weeks of unemployment end on Saturday).  For individuals on PUA who have not exhausted their benefit eligibility of up to 50

4

weeks, the program also provided for continuing benefits for eligible individuals for weeks of unemployment through April 5, 2021. The law also strengthened documentation requirements to ensure PUA program integrity.

10. Additionally, FPUC, which expired July 31, 2020, was reauthorized and modified to provide $300 per week to supplement benefits for weeks of unemployment beginning after December 26, 2020 and ending on March 14, 2021, which was extended to September 4, 2021 by the COVID-19 Relief Bill. FPUC was not payable with respect to any week during the gap in applicability, that is, weeks of unemployment ending after July 31, 2020, through weeks of unemployment ending on or before December 26, 2020.

11. In addition, the time period for receiving the PEUC benefit was extended from December 27, 2020 to March 14, 2021, then through September 4, 2021, and the number of weeks that an individual could claim PEUC benefits was increased from 13 to 24 weeks.

12. Prior to the enactment of the CARES Act, to be eligible for UI administered by the EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim. Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

13.  The CARES Act established a new program -- PUA -- to provide unemployment benefits during the coronavirus pandemic to people who do not qualify for regular UI benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic.  UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

14.  Under the PUA program, workers who are not eligible for regular UI benefits but are unemployed or partially unemployed for a COVID-19-related reason[1] permissible under federal law may receive unemployment benefits for up to 46 weeks.  Under the PEUC program, workers who are eligible for the regular UI benefits for up to 26 weeks may receive an additional 13 weeks of benefits for a total of 39 weeks, which was later increased to a total of 50 weeks.  Under the PAC program, for an individual receiving a regular UI benefit, a PUA benefit, or a

---

[1] COVID-19-related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

PEUC benefit between March 29, 2020 and July 25, 2020, the EDD paid an additional $600 in CARES Act funds for each week of benefits.  Between December 26, 2020 and March 14, 2021, the FPUC program provided an additional $300 per week for unemployment.  Examples of non-business-owner occupations that may qualify a person for PUA benefits include realtor, barber, hairstylist, freelance photographer, construction handyman/woman, gardener, and ride-share driver.[2]

15.  The California EDD began accepting applications for PUA benefits on April 28, 2020.  Applications may be made online from any digital device, including smartphones, that connects to the Internet and is capable of accessing the EDD website's UI benefits page.  To make benefits available as quickly as possible, payments are issued in phases.  If a claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

a.    Phase 1: For claims with start dates from February 2 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

b.    Phase 2: For claims with start dates from March 29 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.

_____

[2] To be eligible, such person must also not be participating in the UI Elective Coverage program. Under the provisions of the California UI Code, employers may elect UI and State Disability Insurance (SDI) or only Disability Insurance coverage for themselves. Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

       c.    <u>Phase 3</u>: For claims with start dates from July 26 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

16.  PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

17.  Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  The EDD may request documentation to provide proof of the stated income.[3]  If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using other resources available to the EDD in order to increase the PUA weekly benefit amount.

18.  Like regular UI claims, PUA claims can be filed online.  When an individual files a PUA claim online, the EDD automatically maintains certain information regarding the filing of the claim.  This information includes the date and time the claim was submitted, the name of the person for whom the claim was filed, and the IP address of the computer, or Internet Service Provider ("ISP") account, that was used to file the claim.

---

[3] In general, the EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

19.   A PUA claimant must answer various questions to establish eligibility for PUA benefits.  The claimant must provide name, social security number ("SSN"), and mailing address.  The claimant must also identify a qualifying occupational status and COVID-19 related reason for being out of work.

20.   After it accepts a UI claim, including a claim submitted pursuant to the PUA program, the EDD typically deposits UI funds every two weeks to an EBP debit card administered by BofA, which the claimant can use to pay for his/her expenses.  The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim.  Claimants can activate their debit card over the phone or online.

21.   When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits.  The EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  On or about April 23, 2020, California Secretary of Labor Julie Su directed the EDD to temporarily suspend the requirement for UI claimants to provide unemployment certifications (Continued Claim Forms).[4]  The Continued Claim Form was waived to prevent any unnecessary delays in dispensing benefit payments.

_____

[4] The temporary suspension of the continued claims forms covered the weeks ending March 14, 2020 through May 9, 2020.

22.   At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

23.   The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of EBP debit cards administered by BofA that are used to access the fraudulently obtained UI benefits.  The co-schemers and their associates use the EBP debit cards to withdraw the fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines ("ATM") and point of sale purchases at merchants across the United States.

**C.   UI Benefit Fraud Schemes**

24.   Based on my conversations with other law enforcement officers, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, among other indicia:

a.   Co-schemers commonly buy or outright steal the personally identifiable information ("PII") of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds.  Co-schemers often buy PII from other fraudsters or from the Dark Web[5] (using cryptocurrency such

_____

[5] Dark Web is the set of web pages on the Internet that cannot be indexed by search engines, are not viewable in a standard web browser, require specific means (such as specialized software or network configuration) in order to access, and use encryption to provide anonymity and privacy for users.  Dark Web has become the Internet's black market in recent years where visitors can make illegal purchases of PII, guns, and drugs, and trade child pornography.

as Bitcoin) and verify that the PII belongs to real persons by checking the PII at background check websites such as Beenverified, Spokeo, Intelius, and Whitepages.

b.    Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  Once the EBP debit cards arrive, co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

c.    Submitting multiple UI claims from the same IP address for multiple claimants.  These claims are sometimes submitted on the same day close in time.

d.    Failing to provide a phone number or provide a wrong number on multiple UI claims so it may be difficult to reach the identity holder.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Summary of Probable Cause

25.    On September 10, 2020, in San Bernardino County, within the Central District of California, Jairo GUIZAR and Nylene AMESQUITA reported together to the San Bernardino County Probation Department's ("SBCPD") office located at 15480 Ramona Avenue, Victorville, California 92395.[6]  Probation officers

---

[6] On November 4, 2019, AMESQUITA was convicted of one count of bank fraud in violation of 18 U.S.C. § 1344(2), and Aiding and Abetting in violation of 18 U.S.C. § 2(a), in the Central District of California. (*United States v. Amesquita, et al.*, ED CR 19-00134-PA-2, ECF 114, Judgment and Commitment (C.D. Cal. Nov. 4, 2019).

conducted a records search for AMESQUITA, learned that she was a convicted felon with an outstanding federal arrest warrant, and shortly thereafter arrested her.  Probation officers separately arrested GUIZAR for violation of his state probation terms, which prohibited him from associating with a convicted felon. Probation officers searched GUIZAR's person and found $500 in U.S. currency with a BofA receipt for a withdrawal of $1,000 using a BofA card number ending in x5386.

26.  SBCPD probation officers and Postal Inspectors searched the Cadillac that GUIZAR drove to the SBCPD office. Officers found four EDD BofA Visa debit cards in the Cadillac and a Microsoft Surface Pro 7 Tablet.  One of the EDD BofA debit cards was in AMESQUITA's name and the three other BofA cards were in names of people other than GUIZAR and AMESQUITA. Probation officers also found $2,440 in U.S. currency in the Cadillac.

27.  Later on September 10, 2020, probation officers and Postal Inspectors searched GUIZAR's residence and a second vehicle, a Chrysler 300C, parked at the residence in Hesperia, California.  In GUIZAR's and AMESQUITA's shared bedroom at the residence, officers found mail from EDD addressed to people other than GUIZAR and AMESQUITA, handwritten notes with other persons' PII, and receipts for transactions using EDD BofA Visa debit cards, and a HP laptop.  In the Chrysler 300C parked at the residence, officers and Postal Inspectors found five additional digital devices, seven additional EDD BofA Visa debit cards in other persons' names, bank receipts, and retail store

receipts.  Officers also found approximately $4,514 in U.S. currency, a white crystalline substance that appeared to be methamphetamine, and drug paraphernalia in the Chrysler 300C.

28.  In sum, Postal Inspectors and probation officers found ten EDD BofA Visa debit cards in other persons' names, approximately $7,454 in U.S. currency, bank and retail store receipts, suspected stolen mail, and handwritten notes with other person's names and PII, during the search of the Cadillac, GUIZAR and AMESQUITA's shared room, and the Chrysler 300C parked at their residence.

29.  BofA provided USPIS with information for approximately 32 presumptively fraudulent EDD claimant accounts linked by common mailing addresses, telephone numbers, and the IP addresses associated with the EDD BofA Visa Debit cards seized from GUIZAR and AMESQUITA on September 10, 2020.  USPIS obtained UI claimant information and EDD deposit records for the BofA accounts associated with each of the EDD BofA Visa debit cards that were found in the Cadillac and Chrysler 300C.  BofA identified 21 additional presumptively fraudulent EDD accounts using PII and EDD letters which were found in GUIZAR's and AMESQUITA's possession and linked by common addresses, telephone numbers, and IP addresses.  In total, EDD deposited approximately $629,520 in UI benefits into the 32 presumptively fraudulent accounts identified by BofA.

30.  USPIS received from BofA ATM surveillance video images, which showed GUIZAR using BofA ATMs to withdraw funds from the victims' EDD BofA Visa debit cards between August 1,

13

2020 through October 25, 2020.  On multiple occasions, GUIZAR
withdrew funds from six different victim EDD BofA debit cards on
a single trip to an ATM.  AMESQUITA and GUIZAR appeared on
surveillance images conducting transactions at adjacent ATMs at
the same time.  Other BofA surveillance images showed GUIZAR in
the driver's seat of the vehicle conducting the transactions at
a drive-up ATM while AMESQUITA is in the passenger seat.  In yet
other images, AMESQUITA was seen in the driver's seat and
conducting the transactions at the drive-up BofA ATM, while
GUIZAR was in the passenger seat.

<strong>V.   STATEMENT OF PROBABLE CAUSE</strong>

31.  Based on my review of the evidence and law enforcement
reports in this investigation, my participation in this
investigation (including search of the belongings of GUIZAR and
AMESQUITA), and conversations with other law enforcements
officers, I am aware of the following:

**A.   GUIZAR and AMESQUITA Arrested at Probation Office**

32.  On September 10, 2020, GUIZAR reported to the SBCPD
located in Victorville, California as required by the terms of
his Post Release Community Supervision ("PRCS").  GUIZAR had
previously reported to SBCPD that he was homeless, and GUIZAR
now provided probation officers with his new home address on 9th
Avenue in Hesperia, California.  GUIZAR arrived at SBCPD with a
woman.  An SBCPD Officer asked for the woman's name so that he
could determine if she was a convicted felon.  She identified
herself as Nylene AMESQUITA but declined to provide her date of
birth.  The officer searched law enforcement records for her

name and identified her as having the date of birth of July 31, 1992.  The officer's records check revealed that AMESQUITA was wanted by the U.S. Marshals Service on a federal warrant for violating the conditions of her federal supervised release. AMESQUITA confirmed her date of birth and was then arrested.

33.  Upon AMESQUITA's arrest, GUIZAR pulled out $500 in cash from his wallet and gave it to AMESQUITA.  GUIZAR stated that the money should be added to her jail account.  Officer Luna detained GUIZAR and searched his person pursuant to his PRCS terms.  Officer Luna's report indicated that GUIZAR's PRCS search terms required him to "[s]ubmit to a search and seizure of your person, residence and/or property under your control, at any time of day or night, without a search warrant by any law-enforcement officer and with or without cause."[7]

34.  On GUIZAR's person, probation officers found an additional $500 in cash and a BofA receipt showing a $1,000 withdrawal using the card ending in x5386 on September 9, 2020. GUIZAR also carried keys to a black 2018 Cadillac sedan, which was parked in front of the SBCPD office.  GUIZAR gave his car keys to officers, and Probation Officer Michelle Stephens conducted a preliminary search of the Cadillac and found $2,440 in U.S. currency and four EDD BofA Visa debit cards.  One of the debit cards had AMESQUITA's name and the three other debit cards

---

[7] On February 13, 2020, GUIZAR was convicted of felony attempted making, possessing, and uttering of fictitious instrument in violation of California Penal Code Sections 664, 476(f), in the Superior Court of California, County of San Bernardino.

had names other than that of GUIZAR and AMESQUITA.  GUIZAR was arrested for violating the terms of his probation, which prohibited him from associating with convicted felons.

**B.    Probation and USPIS Search of GUIZAR and AMESQUITA Residence**

35.   Probation officers reported GUIZAR's and AMESQUITA's arrest to USPIS.  Postal Inspectors knew GUIZAR from previous and ongoing investigations.  Similarly, Postal Inspectors knew AMESQUITA for her prior conviction involving a mail theft and bank fraud scheme.[8]  Thus, on the same day, September 10, 2020, A SBCPD Probation Officer, accompanied by U.S. Postal Inspectors, conducted a felony probation compliance check at GUIZAR's residence located on 9th Avenue in Hesperia, California.

36.   Upon arrival at GUIZAR's and AMESQUITA's residence, Probation Officer Ramirez spoke to the homeowners, D.W. and R.W., and their daughter T.W., who also lived at the residence. The Probation Officer explained to the homeowners and T.W. that he was conducting a probation compliance check of GUIZAR.  The homeowners confirmed that GUIZAR also lived at the residence. T.W. said that she was a friend of GUIZAR's and that she had rented a room to both GUIZAR and AMESQUITA.  A records check determined that T.W. was also on probation and subject to search terms.

---

[8]  AMESQUITA is serving a term of federal supervised release following her November 4, 2019 conviction for bank fraud in ED CR 19-00134-PA-2.

37.   Officer Ramirez searched GUIZAR and AMESQUITA's
bedroom which was located on the north side of the house near
the kitchen.  In a closet in GUIZAR's and AMESQUITA's bedroom,
Officer Ramirez found a black backpack, which contained
handwritten notes with names, dates of birth, and SSNs.  A
second black bag in the closet contained mail addressed to
GUIZAR together with mail addressed to people other than GUIZAR,
AMESQUITA, D.W., R.W., or T.W.  The Probation Officer found a
gray Targus laptop bag on a closet shelf.  The laptop bag
contained a silver HP laptop, mail addressed to GUIZAR, and
additional mail bearing the names and addresses of people other
than GUIZAR, AMESQUITA, T.W., D.W., and R.W.

    **C.    USPIS Interviews of GUIZAR and AMESQUITA**

38.   Still on September 10, 2020, after the probation
compliance check and search of GUIZAR's room, probation officers
and Postal Inspectors took GUIZAR and AMESQUITA from the SBCPD
to GUIZAR's residence.  A Postal Inspector interviewed GUIZAR
outside of the residence.  The Postal Inspector had previously
interviewed GUIZAR on May 15, 2019 in Reno, Nevada in connection
with an unrelated investigation.[9]  Before being *Mirandized*,
GUIZAR spontaneously said, "I haven't been doing nothing."  The

---

[9] On May 9, 2019, GUIZAR and AMESQUITA's brother Adrian
Amesquita were arrested in Reno, in possession of thousands of
pieces of stolen mail, credit cards, checks, and white
crystalline substance.  On May 15, 2019, Postal Inspectors
interviewed GUIZAR, who confessed to working with co-
conspirators to steal mail from the back of post offices in
California, Arizona, and Nevada and stealing victims' identities
to fraudulently use their bank cards to access their accounts.
GUIZAR has not yet been charged in connection with the May 9,
2019 arrest.

Postal Inspector read GUIZAR his *Miranda* rights.  GUIZAR said he
understood his rights and agreed to answer questions.  GUIZAR
denied knowledge of the items that probation officers found in
the Cadillac.  GUIZAR denied any involvement in suspected fraud
activities.  The Postal Inspector also interviewed AMESQUITA,
who invoked her right not to speak without an attorney present
after the Postal Inspector advised her of her *Miranda* rights.
AMESQUITA then stated that she did not know about the warrant
for her arrest on a supervised release violation, and the
interview ended shortly thereafter.

**D.   USPIS Find Receipts and EDD BofA Debit Cards in
     Chrysler**

39.   Also on September 10, 2010, while still at GUIZAR's
residence, probation officers and Postal Inspectors saw a black
Chrysler 300C parked in the driveway of GUIZAR's residence.  A
Postal Inspector contacted Nuestra Gente Auto Center with
information he obtained from a temporary identification sticker
on the Chrysler's front windshield.  The dealership told the
Postal Inspector that the Chrysler had been sold to an
individual, N.R., and provided the Postal Inspector with N.R.'s
telephone number.  The Postal Inspector and Probation Officer
called N.R. who stated that AMESQUITA borrowed his Chrysler but
had not yet returned it.  N.R. had not been unable to locate
AMESQUITA and the Chrysler for several weeks.  N.R. stated that
he wanted the Chrysler returned to him.  N.R. consented to law
enforcement's search of the Chrysler and gave consent to seize
items from the vehicle.  N.R. requested that the Chrysler be

towed to the Nuestra Gente car dealership after officers searched it.

40.   The Probation Officer, the Postal Inspector, and I searched the Chrysler and found, among other things, the following items:

a.   $4,500 in cash in the center console;

b.   A fanny pack containing a white crystalline substance and drug paraphernalia;

c.   Seven EDD BofA Visa debit cards found in the center console ending in the following numbers:

i.   x4780 bearing victim name R.C.

ii.  x4020 bearing victim name P.A.

iii. x7016 bearing victim name B.H.

iv.  x4822 bearing victim name L.J.

v.   x8235 bearing victim name J.L.

vi.  x8322 bearing victim name A.S.

vii. x5386 bearing victim name S.U.

d.   Inside the Chrysler, Postal Inspectors found numerous receipts for retail purchases, letters, casino rewards cards, and casino receipts with AMESQUITA's name.  Specifically, Postal Inspectors found the following receipts and miscellaneous documents in the Chrysler:

i.   One BofA withdrawal receipt for $1,000 dated September 9, 2020 using a card ending in x7235, which was later determined to be connected to an EDD BofA account for victim J.S.

ii.  One BofA withdrawal receipt for $1,000 dated

19

September 9, 2020, for card ending in x7392, which later
determined to be connected to an EDD BofA account for victim
L.D.

iii. One Best Buy receipt dated September 9,
2020, for a $2,011.32 purchase for several items including a
Targus laptop bag, a black matte Microsoft Surface Pro 7, and
additional Microsoft Surface Pro accessories paid for using a
debit card ending in x7392 with the name of victim L.D.

iv.   One BofA withdrawal receipt for $1,000
dated August 28, 2020, for a card ending in x9517, later
determined to be connected to an EDD BofA account for victim
A.V.

v.   Receipts for purchases at DD's Discount
Store and at Walmart paid for with a card ending in x9517 issued
to victim A.V.

**E.   Probation and USPIS Search of Cadillac**

41.   Later on September 10, 2020, Probation Officer
Ramirez, Postal Inspector Galvez, and I conducted a more
thorough search of the black 2018 Cadillac while it was parked
in front of the SBCPD office at 15480 Ramona Avenue,
Victorville, California.  GUIZAR had driven the Cadillac to the
SBCPD Offices with AMESQUITA as a passenger.  SBCPD officers had
already conducted a brief probation search of the Cadillac.  The
additional thorough search of the Cadillac was also under the
terms of GUIZAR's state probation.  The following items were
discovered during the second search of the Cadillac:

a.   A Chase Bank debit Visa card ending in x1622 in

20

GUIZAR's name was found in the center console cup holder;

        b.   In the glove compartment, a sales contract for the purchase of the Cadillac for $26,000 cash dated September 4, 2020, listing R.A., AMESQUITA's brother, as the purchaser.

        c.   Also in the glove compartment were four Morongo Casino W2 Gambling Winning receipts dated September 10, 2020. Two of the receipts were under GUIZAR's name and the other two were under AMESQUITA's name.

        d.   Receipts for repairs to a 2010 Mercedes under GUIZAR's name, showing a cash deposit of $1,232.95 on September 8, 2020.

        e.   Receipts for the purchase of furniture in the amount of $5,358.94 paid for with cards ending in x1363 and x1622 under GUIZAR's name.

        f.   A black and purple Targus laptop bag was found on the backseat behind the driver's side containing a Microsoft Surface Pro 7 Tablet.  The device lock screen showed the names "Nylene and Jairo," the first names of AMESQUITA and GUIZAR.

        g.   Inside the laptop bag, there was a white and orange Nike Air Jordan pouch containing the following:

            i.   $2,440 in cash;

            ii.   AMESQUITA's California identification card, various credit cards and an EDD BofA Visa debit card ending in x8458 in AMESQUITA's name;

            iii. An Allstate Auto Insurance document for the Chrysler 300C with name of N.R.;

iv.   One EDD BofA Visa debit card ending in x7235 in the name of victim J.B.

v.   One EDD BofA Visa debit card ending in x7392 in the name of victim L.D.; and

vi.   One EDD BofA Visa debit card ending x9517 in the name of victim A.V.

42.   The Cadillac was released to the registered owner, R.A., on September 10, 2020.  Postal Inspectors interviewed R.A. and read R.A. his *Miranda* rights.  R.A. said that he understood his rights and agreed to answer questions.  He denied being involved in mail and identity theft activity.  He said he purchased the Cadillac with $13,000 he saved from working as a dental assistant and was in the process of making payments on the car.  He said he had let GUIZAR borrow the car about four days earlier.

**F.   USPIS Discovery of Fraudulent Transactions on EDD BofA Debit Cards**

43.   Based on my review of the above-described evidence collected in connection with this investigation, I conducted a further investigation on the UI benefits suspected to be fraudulently obtained and used by GUIZAR and AMESQUITA.  The following transactions are merely a sampling of suspected fraudulent transactions discovered to date:

**1.   Cadillac Purchased Using EDD BofA Debit Cards**

44.   On September 10, 2020, officers found on GUIZAR's person a BofA receipt dated September 9, 2020, for a $1,000 withdrawal using the card ending in x5386.  Postal Inspectors

later found in the Chrysler, the EDD BofA Visa debit card ending in x5386 bearing the name of victim S.U.  Transaction records show that S.U.'s debit card ending in x5386 was also used on September 4, 2020 at Victorville Auto Sales for a $13,000 charge.  An EDD BofA Visa debit card ending in x4020 bearing victim name "P.A.," was also found in the Chrysler.  According to transaction records, the card ending in x4020 was used on September 4, 2020 at Victorville Auto Sales for a charge of $13,000 for the purchase of the Cadillac.  The dates and amounts of these two charges correspond to the Victorville Auto Sales receipt found in the Cadillac, which showed a purchase price of $26,000 dollars for the Cadillac on September 4, 2020.

45.  On March 17, 2021, I visited Victorville Auto Sales with another Postal Inspector and spoke with employee E.M. regarding the payments made to the dealership using EDD BofA Visa debit card ending in x5386 for $13,000 and EDD BofA Visa debit card ending in x4020 for $13,000 on September 4, 2020.  In an interview with E.M., he told me, among other things, the following information:

a.  On September 4, 2020, R.A. arrived at the dealership with a female with long black hair, which he introduced as his sister.  E.M. could not recall R.A.'s sister's name.  E.M. recalled the transaction because R.A. appeared to have shopped their website prior to coming in and knew he wanted the Cadillac.  E.M. thought R.A. "was a picky customer."

b.    E.M. handled the sale of the Cadillac to R.A. for a total price of $26,000 dollars.  E.M. recalled being told that the car would not be financed.

c.    R.A. provided his California Driver's license and contact information for the purchase of the car.  E.M. made a photocopy of R.A.'s license and retained it in a paper file.

d.    R.A. paid for the Cadillac using debit cards ending in x5386 and x4020.  R.A. charged $13,000 on each debit card to pay the total price of $26,000 for the Cadillac.

e.    E.M. assumed that the debit cards belonged to R.A. and did not look at the cards himself.  E.M. did not recall seeing R.A. enter the required pin codes when she used the debit cards.

f.    E.M. did not recall seeing the victim name of S.U. printed at the bottom of the Merchant Copy Debit Card receipt for the debit card ending in x5386.

g.    E.M. did not recall seeing the victim name of P.A. printed at the bottom of the Merchant Copy Debit Card receipt for the debit card ending in x4020.

h.    On or about November or December 2020, R.A. came into the dealership and asked E.M. for assistance in obtaining copies of the purchase of the car and the registration.  R.A. told him that the Cadillac had been stolen along with the document in it and he needed to file a police report.

## 2.    Victim P.A. Transactions

46.  ATM surveillance images obtained in this investigation show that GUIZAR used victim P.A.'s card ending in x4020 to

24

withdraw $1,000 on August 29, 2020, another $1,000 on August 30, 2020, and another $1,000 on September 3, 2020 from an ATM.  ATM surveillance images also show that AMESQUITA used victim P.A.'s card to withdraw $1,000 on September 2, 2020 at a drive-up ATM with GUIZAR in the passenger seat of a black Chrysler.  From August 29, 2020 through September 10, 2020, victim P.A.'s card was charged for eight transactions totaling approximately $20,000.  The handwritten notebook found in AMESQUITA's and GUIZAR's bedroom contained e-mail addresses that contained both victim S.U.'s and victim P.A.'s names.  The same notebook contained AMESQUITA's e-mail address and her password.

47.  During the September 2, 2020 transaction at a drive-up ATM, AMESQUITA is seen on surveillance images making $1,000 withdrawals from each of the following victims' accounts:

i.  Victim A.S.'s EDD BofA card ending in x8322 to withdraw $1,000;

ii.  Victim B.H.'s EDD BofA card ending in x7016 to withdraw $1,000;

iii. Victim S.U.'s EDD BofA card ending in x5386 to withdraw $1,000;

iv.  Victim R.C.'s EDD BofA card ending in x4780 to withdraw $1,000; and

v.  Victim C.T.'s EDD BofA card ending in x7539 to withdraw $1,000.

### 3.  Victim C.T. Transactions

48.  According to BofA records and surveillance images, GUIZAR used victim C.T.'s EDD BofA card ending in x7539 to

withdraw $1,000 from an ATM in Victorville, California on August 30, 2020. Victim C.T.'s name and EDD BofA card were used at the Red Roof Inn for two separate $50 transactions on September 7, 2020. The receipts for these transactions were found in the Chrysler. Red Roof Inn receipts for another room at the same location under AMESQUITA's name were also found in the Chrysler. In addition, as mentioned above, AMESQUITA is seen on surveillance images dated September 2, 2020 withdrawing $1,000 from C.T.'s EDD BofA card ending in x7539. Surveillance images also show AMESQUITA's brother R.A. using victim C.T.'s EDD BofA card ending in x7539 to make three withdrawals totaling $900 on September 13, 2020. From August 29, through October 24, 2020, victim C.T.'s card was charged with transactions totaling approximately $30,900.

### 4.   Victim L.D. Transactions

49.   EDD records show that victim L.D.'s BofA account was linked to the EDD BofA card ending x7392, which was found in the Cadillac that GUIZAR drove to SBCPD. From August 29, 2020 through October 21, 2020, EDD deposited $29,550 in unemployment benefits into victim L.D.'s BofA account. In a purple backpack inside the Chrysler, officers found a Best Buy receipt dated September 9, 2020 for a $2,011.32 purchase of several items including a Targus laptop bag, a black matte Microsoft Surface Pro 7, and additional Microsoft Surface Pro accessories paid for using a debit card ending in x7392 with victim L.D.'s name. Best Buy surveillance video and images show that AMESQUITA used victim L.D.'s card ending in x7392 to purchase the black and

purple Targus laptop bag later found in the Cadillac containing
the Microsoft Surface Pro 7 Tablet.  The device lock screen
showed the names "Nylene and Jairo."  L.D.'s EDD BofA account
was charged $9,011.32 for transactions dated September 6, 2020
through October 25, 2020.  Surveillance images show AMESQUITA
making three cash withdrawals totaling $3,000 on October 25 and
October 26, 2020 with victim L.D.'s EDD BofA card ending x3623
newly issued on October 9, 2020 after AMESQUITA's arrest on
September 10, 2020.  GUIZAR is also seen on surveillance images
standing behind AMESQUITA.

### 5.   Victim L.S. Transactions

50.  Victim L.S.'s name and SSN were written on the back of
a letter found during the search of GUIZAR and AMESQUITA's
closet.  BofA records show that victim L.S.'s account linked to
the EDD BofA card ending x0410 received approximately $9,300 in
EDD deposits in UI benefits from July 27, 2020 through October
21, 2020.  According to BofA records and surveillance images,
AMESQUITA used victim L.S.'s EDD BofA card ending in x0410 to
withdraw $900 from a drive-up ATM in Victorville, California on
August 27, 2020.  AMESQUITA is seen in surveillance images
driving the Chrysler 300C with GUIZAR in the passenger seat.

### 6.   Victim A.S. Transactions

51.  An EDD letter addressed to victim A.S. containing his
SSN was found during the search of GUIZAR's and AMESQUITA's
closet.  BofA records show that victim A.S.'s account linked to
the EDD BofA card ending x8377 received approximately $23,700 in
EDD deposits in UI benefits from August 6, 2020 through August

31, 2020.  According to BofA records and surveillance images,
GUIZAR used victim A.S.'s EDD BofA card ending in x8377 to
withdraw $1,000 from an ATM in Hesperia, California on September
1, 2020.  AMESQUITA used victim A.S.'s EDD BofA card ending in
x8377 to withdraw $1,000 from a drive-up ATM in Victorville,
California on September 2, 2020.  Surveillance images show
AMESQUITA driving the Chrysler while GUIZAR sat in the passenger
seat during the September 2, 2020 transaction.

### G.    The UI Claims Were Fraudulent

52.    The UI benefits have become a prime target for fraud.
Based on the evidence recovered during the search of GUIZAR's
and AMESQUITA's residence and vehicles on September 10, 2020 and
records provided by EDD and Bank of America, I have identified
approximately 32 fraudulent EDD UI claims that are linked to
GUIZAR and AMESQUITA.  Some of these accounts share common
account information including mailing addresses used to receive
the EDD mailings and telephone numbers listed in the UI claims.
Other accounts are linked to GUIZAR and AMESQUITA through BofA
surveillance images showing GUIZAR and AMESQUITA using the
cards.  And yet other accounts are linked to GUIZAR and
AMESQUITA because the listed addresses are linked to known
associates of AMESQUITA and GUIZAR who appeared on BofA
surveillance images with GUIZAR.

53.    Of the presumptively fraudulent 32 EDD UI claims I
identified, approximately 19 UI claims were filed for
individuals who were residing outside of the State of California
and were therefore not eligible for UI benefits in through

28

California EDD.  At least 19 of the individuals whose PII was used in UI claims were not eligible to receive UI benefits because they did not meet EDD's eligibility requirements.  Those individuals were not: (1) residing in the State of California; (2) had not previously worked in the State of California; and/or (3) available for work in the State of California.  I conducted phone interviews with the following victims:  L.D. from Sparks, Nevada on September 22, 2020; J.G. from Spring Valley, California on October 2, 2020; L.J. from Hammond, Louisiana on October 13, 2020; P.A. from Tucson, Arizona on October 20, 2020; A.S. from Las Vegas, Nevada on February 10, 2021; A.T. from Bakersfield, California on January 11, 2021; and L.S. from Fontana, California on January 6, 2021.  None of those individuals stated that they had previously applied for UI benefits in the State of California.  With the exception of victim A.S., none of the victims were aware that their identity had been stolen.  Victim A.S. had been previously notified by Placer County Sheriff's Department that his stolen Wells Fargo credit card had been recovered in a car in which GUIZAR had been identified as the passenger.  All of the victims desired prosecution of those responsible for stealing their identities.

54.  On or about December 15, 2020, I mailed out USPIS questionnaires to additional victims identified during this investigation.  I received separate responses from victims O.F., E.G. and S.F. from Tucson Arizona; victim J.S. from Cornelius, North Carolina, and victim E.L. from Chula Vista, California. None of those individuals stated that they had previously

29

applied for UI benefits in the State of California.  Victim E.G.
reported that his Wells Fargo bank card had been stolen on or
about September 2020 and had been used fraudulently by unknown
individuals.  All of the victims desired prosecution of those
responsible for stealing their identities.

55.  The remaining claims also had indicia of fraud.  Based
on my training and experience, I know that individuals scheming
to fraudulently obtain UI benefits generally follow recognizable
patterns, including the following, among others:

a.  Using the identities of other people to file for
fraudulent UI benefits in the other persons' names and then
collecting the UI funds.  In some instances, the named claimants
are victims of identity theft; in other instances, the named
claimants have provided their personal identifying information
to the schemers and have agreed to pay the schemers a portion of
the fraudulent benefits that are obtained; in yet other
instances, the named claimants believe they may be entitled to
benefits but do not know that the schemers are reporting false
information to EDD to fraudulently increase the amount of the
benefits claimed.

b.  Using addresses the schemers control as the
addresses submitted to EDD for the claims so that EBP debit
cards and other EDD correspondence will be mailed to these
addresses and thus be accessible to the schemers.  According to
EDD and BofA records, approximately 10 different addresses were
used to submit all 32 EDD UI claims.  I identified seven of the
mailing addresses as being the residences of individuals

associated with GUIZAR, AMESQUITA, or both, from previous mail theft investigations I have conducted.  Several of these associates used the addresses to receive UI claim mailings in their own names, including one UI claim filed by AMESQUITA in her own name and another filed by AMESQUITA's sister-in-law. All ten mailing addresses are located within the County of San Bernardino.

c.   Submitting claims close in time.  AMESQUITA filed an EDD UI claim in her own name on June 5, 2020.  GUIZAR filed an EDD UI claim in his own name on June 27, 2020.  On July 10, 2020, EDD UI claims for victim O.F. and E.G. where filed using the same IP used for GUIZAR's claim.  The remaining 30 fraudulent UI claims were filed between July 10, 2020 and August 26, 2020.

d.   Providing similar or identical identifying information across multiple different claim applications.  Here, the majority of the claims indicated that the last work date for the claimant was February 3, 2020 or March 22, 2020. Approximately 29 of the claims asserted that the claimant was self-employed.  Approximately 11 claims indicated that the claimant had a bachelor's degree.  Approximately 5 claims indicated the claimant had a master's degree and 9 indicated that the claimant had an associate's degree.  Additionally, most of the applications indicated that the claimants' income was either $170,000, $175,000, $180,000, or $185,000.  Some of the UI claims submitted also showed similarities in the telephone numbers provided:

31

                    i.   Four UI claims used telephone number (323)
XXX-0089, which is the same telephone number listed as a contact
work number for GUIZAR in a Dream Cars receipt law enforcement
found during the search on September 10, 2020, which was for the
repair of a Mercedes identified as being driven by GUIZAR;

                    ii.  Five UI claims used the telephone number
(661) XXX-8196, which is the same telephone number used by
GUIZAR for his own EDD UI claim.  The UI application for victim
J.S. used this same telephone number as the contact number for
their employer, although they indicated they were self-employed;

                    iii. Four UI claims used telephone number (760)
XXX-0975, which was listed as a home telephone number for GUIZAR
in the Dream Cars receipt law enforcement recovered during the
search on September 10, 2020, which was for the repair of a
Mercedes identified as being driven by GUIZAR;

                    iv.  Three UI claims used telephone number (619)
XXX-9856, which is the same cell phone number listed as a
contact number for GUIZAR in a Dream Cars receipt recovered
during the search on September 10, 2020 for the repair of a
Mercedes identified as being driven by GUIZAR;

                    v.   One UI claim used the telephone number (909)
688-3178, which was the same number used for AMESQUITA's UI
application.

        **H.   Analysis of Bank of America Records**

On September 30, 2020, and again on November 13, 2020, I
received records from Bank of America based on the EDD BofA
debit cards, the EDD mail, and the handwritten PII recovered

                                32

during the search of GUIZAR's and AMESQUITA's residence and two cars.  BofA provided additional BofA EDD accounts linked to the records I had initially requested based on the common mailing addresses associated with the BofA EDD accounts.  I conducted a review of the Bank of America records and I identified a total of 32 presumptively fraudulent EDD claimant accounts.  These accounts had received approximately $629,520 from EDD.  Approximately $534,952.97 of the funds had been debited by either purchases, ATM withdrawals, and money transfers dated between July 14, 2020 and October 16, 2020.

## VI.   CONCLUSION

56.  For all the reasons described above, there is probable cause to believe that GUIZAR and AMESQUITA have committed violations of Title 18, United States Code, Sections 1708 (Possession of Stolen Mail) and 1343 (Wire Fraud).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 9th day of
April 2021.

_____
HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE